UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KIMBERLY SIMON                             CIVIL ACTION NO. 13-CV-3074

VERSUS

SCHLUMBERGER TECHNOLOGY                    MAGISTRATE JUDGE HANNA
CORPORATION

MEMORANDUM RULING

Before the court is the re-urged motion for summary judgment filed by

Schlumberger Technology Corporation [Schlumberger][Rec. Doc. 32] seeking

dismissal of the plaintiff's claims against it under the Americans with Disabilities

Act.  The re-urged motion is opposed by the plaintiff, Kimberly Simon. [Rec. Doc.

34].  For the reasons set forth below and discussed at oral argument, the motion, as

re-urged, is GRANTED.

**Factual and Procedural Background:**

Since the Court's consideration of Schlumberger's first summary judgment

motion, and in response to the Court's comment that "[n]either the defendant's HR

manager nor the healthcare provider were deposed in the case,"  deposition

testimony was taken from Schlumberger's Human Resources manager Mary

Elizabeth Lackey and made a part of the record.  Declarations were also submitted

from Adrian Moss and Franklin David Linares Scarione, and additional evidence

was submitted by Simon, including a copy of correspondence between Simon and

Lackey.  Having reviewed those submissions, the Court makes the following factual findings:

Simon has a college degree in chemical engineering.  In July, 2012, she was hired by Schlumberger as a field engineer trainee in its drilling and measurements section.  She requested no accommodations during the application and interview process.[Rec. Doc. 32-4, p. 26].  She passed a required functional capacity test before beginning her assignment; she again did not ask for any accommodation. [Rec. Doc. 18-4, p. 29]. She was sent for 8 weeks of classroom and on-the-job training in Youngsville, Louisiana.[Rec. Doc. 32-4, p. 45].  The training was led by Adrian Moss. It was designed to prepare participants to pass the entrance examination for admission to the more advanced Schlumberger Learning Center in Houston/Sugarland, Texas. [Rec. Doc. 32-6, p. 3].

During her training, Simon came to understand that Schlumberger accommodates employees in need of reasonable accommodations. [Rec. Doc. 32-4, p. 31]. Soon after arriving at the Youngsville training site, she requested a private bathroom in the company-provided housing, disclosing to Adrian Moss that she had an inflammatory bowel disease (ulcerative colitis). [Rec. Doc. 32-4, pp. 35, 41-44; Rec. Doc. 32-6, pp. 3, 6].  She did not request any accommodation regarding the training course, nor did she notify the employer that her condition

2

impaired her ability to complete the course or pass the entrance exam.  She was provided with the requested private bathroom.   Also during the Youngsville training, Simon asked for time off for doctor's appointments, which were allowed, without adverse consequences. [Rec. Doc. 32-4, pp. 36-38; Rec. Doc. 32-6, pp. 3, 6-8].

At the end of the training program, the trainees, including Simon, were assigned to Schlumberger's Learning Center in Houston (Sugarland), Texas.  Each was required to pass an entrance exam to continue training and employment with the company.   On leaving Youngsville for Texas, Simon told her manager/instructor (Adrian Moss) that she did not feel ready for the entrance exam.  She gave no other detail; she did not mention her medical condition or ask for medical leave. She did not ask for an accommodation from Moss to take or pass the entrance exam, and she did not notify Moss that her medical condition impaired her ability to complete the training course, study for the entrance exam, or pass the exam. [Rec. Doc. 32-4, pp. 50; Rec. Doc. 32-6, pp. 3-4].  Moss interpreted Simon's comments as ordinary nervousness, a common occurrence among trainees. He encouraged Simon to take practice tests which were provided online and to study her materials and told her she would be fine.[Rec. Doc. 32-4, p. 50; Rec. Doc. 32-6, p. 4].

Simon  understood that the first step at the Texas Learning Center was passing the entrance exam, which was a condition of her employment and  an essential function of her position. [Rec. Doc. 32-4, pp. 64, 129]. Once in Texas, Simon  requested no accommodation for the taking or completing the exam; she did not notify anyone in Schlumberger management or human resources personnel that a medical issue impaired her ability to study for or complete the exam. [Rec. Doc. 32-4, pp. 64-65; Rec. Doc. 32-6, p. 4; Rec. Doc. 32-3, p.5].

Simon failed the entrance examination on her first attempt which was taken on October 29, 2012.  In accordance with company protocol, she met with her instructor (Franklin Linares Scarione) to review her results, and  together they identified weakness areas and topics, and they confected an action plan for the second testing, which Simon signed. [Rec. Doc. 32-3, pp. 18-19]. She was encouraged to ask for help if she had any difficulties or needed additional assistance.  She asked for no accommodation, and she did not otherwise notify Scarione that a medical issue impaired her ability to complete the entrance exam. [Rec. Docs. 32-3, pp. 18-19; 32-4, pp. 67-69;Rec. Doc. 32-5, p. 3].

Trainees who failed the examination on the first try were given a single retest opportunity. [Rec. Doc. 32-4, p. 48; Rec. Doc. 32-5, p. 3]. Simon was given a written warning that scoring below the pass mark a second time would result in

automatic release from the training center.  She did not tell her Texas instructors that she was not ready to take the examination or that she needed time off. [Rec. Doc. 32-4, pp. 77-78; Rec. Doc. 32-3, p. 18]. According to Simon, she told no one in Texas that she had colitis and she did not tell her instructor she was on medication.  She knew she was going to fail and had given up. [Rec. Doc. 32-4, pp. 70-71].

On the day of her second testing, Simon overslept, arrived one hour late for the test, and was disciplined with a warning letter.  She did not request accommodations to complete the entrance exam or otherwise blame her tardiness on a medical condition or notify her instructor that a medical issue impaired her ability to complete the exam. [Rec. Doc. 32-4, pp. 71-73; Rec. Doc. 32-5, p. 3].

Simon failed the examination on her second attempt which was taken on October 31, 2012. Because she had failed the exam twice, she could not proceed in the training program, and she was released from the Learning Center to return to her training location in Youngsville, Louisiana.   Simon signed an acknowledgment that she had received a Release Letter from the Learning Center due to her failure to pass the entrance exam on two attempts. She also acknowledged receipt of a Written Warning regarding her tardiness. [Rec. Doc. 32-3, pp. 16-17; Rec. Doc. 32-5, p. 3]. She met in person again with her instructor

Scarione.  She did not mention colitis or her medications, and she did not request any accommodations to complete the entrance exam or notify Scarione that a medical condition impaired her ability to complete the exam. [Rec. Doc. 32-4, p. 75].  She was told she would be terminated. [Rec. Doc. 32-4, p. 77].

After her release from the Texas Learning Center, Simon sent an email to Scarione, at 12:24 a.m. on November 2, 2012.  She expressed her sadness and disappointment at her failure.  She described her attempt to think what she had done wrong, what she had forgotten to study, and what she could have done better to be more successful on the exam.  She expressed her belief that "my downfall at Eng-1 was my lack of rig time.  I'm a hands-on learner and I think most of the questions I missed, I probably would have not if I had been given the proper pre-training on a rig." [Rec. Doc. 32-5, p. 6].  She expressed her understanding that she would be terminated in a meeting November 2, 2012 at 3:00 p.m., and she asked for Scarione's help, explaining that "when someone fails they are fired, no exceptions." [Rec. Doc. 32-5, p. 6].  Throughout her communications with Scarione, Simon made no mention of a medical issue as an impairment to her ability to complete the entrance exam or a reason for her failure.

Schlumberger's  Human Resources manager in Youngsville, Mary Elizabeth Lackey learned of Simon's second failure on November 1, 2012 (she also received

notice of another trainee's failure).  Pursuant to Schlumberger policy and practice, she scheduled a meeting with Simon for the next day, with the intention to terminate her employment with the company.  Adrian Moss was also present at the meeting.   Lackey confirmed with Simon that she had enjoyed access to the company's on-line cards and documentary training materials to prepare for the entrance exams, and Lackey otherwise solicited Simon's thoughts on the training program and the exam and why she thought she had failed. [Rec. Doc. 32-4, pp. 107, 109-110, 112; Rec. Doc. 32-3, p. 5].   Simon responded that she didn't feel prepared for the exams and that she didn't have enough rig time. [Rec. Doc. 32-7, p. 42].

Simon was excused from the room while Lackey and Moss conferred.  They agreed that Simon's failure of what they considered to be a 'basic test' was a disappointment, but since passing the entrance exam is a necessary qualification for moving forward at the Learning Center and in Schlumberger employment, they proceeded with the termination process.  Simon was invited back into the meeting, and she was told by Adrian Moss that she would be terminated. [Rec. Doc. 32-7, p. 43]. It was at that point that Simon notified the managers for the first time that she  had a medical condition that had prevented her from passing the exams.  She requested accommodation–additional time to take the exam a third time after she

controlled her medical condition. [Rec. Doc. 32-4, pp. 53-54, 56, 107, 114-115; Rec. Doc. 32-7, pp. 43-44]. When asked why she had not brought the subject up before, Simon responded that she "didn't think about it." [Rec. Doc. 32-7, p. 45]. She offered no other explanation why she had not requested accommodation prior to going for the exams. [Rec. Doc. 32-7, p. 45].

Excusing Simon from the meeting again, Lackey confirmed with Adrian Moss that he had no prior knowledge of a medical condition impairing Simon's ability to perform in school. [Rec. Doc. 32-7, p. 46].  The termination process was "suspended" at that point. According to Lackey:

> She had been terminated.  We told her she was terminated, but because she brought this information so late in the game, I wanted to make sure we had not missed something.  So we suspended her with pay pending further investigation of her discussion that she needed an accommodation.  I needed time to find out what had happened. [Rec. Doc. 32-7, p. 48].

Lackey contacted the Texas Learning Center to find out if Simon had raised the medical issue at the Center, and confirmed that Simon had not. Learning Center personnel confirmed that Simon's debriefing responses made no mention of a medical condition as a reason for failing the exams. [Rec. Doc. 32-7, pp. 48-49].  Lackey also confirmed with Moss that the only accommodation sought by Simon at the Youngsville location was the private restroom request which had

8

been granted.  She then commenced Schlumberger's protocol relative to the Americans with Disabilities Act. [Rec. Doc. 32-7, p. 46].

Simon was suspended with pay so that she could access and complete Schlumberger's ADA accommodation paperwork, including documents to be completed by her healthcare provider. Lackey provided forms to Simon, explaining that she should take the forms to her doctor, have them completed and returned to Lackey so that a decision could be made about her employment.  [Rec. Doc. 32-3, pp. 21-26; Rec. Doc. 32-7, pp. 46-47].  The document packet intended for Simon's healthcare provider included a cover letter to Simon with the following instruction:

> A statement from your medical provider.  Please take the enclosed Clarifying Accommodations Form and your job description to your medical provider and review how your medical condition may affect the essential functions of your job.  Ask your medical provider to indicate in writing what major life activities are limited and to offer suggestions, if any, for the type of accommodation(s) that would assist you with being able to perform your essential job functions. [Rec. Doc. 32-7, p. 104].

Another explanatory letter was provided for Simon to give to her doctor, along with a Functional Job Description and a form entitled 'Clarifying Accommodations.' [Rec. Doc. 32-7, pp. 104-114].  Lackey discussed with Simon getting the completed forms back by November 7. [Rec. Doc. 32-7, p. 69].

Simon  testified that she never really looked at the document packet.  "To be honest, I just took it, gave it to my doctor.  I never read through it." [Rec. Doc. 18-4, p. 79].  According to Simon:

A.   I said that–I said: From my understanding, I said, she just needs to know that I do have a medical condition, but that I can physically do the job.  That's what I told her.

Q.   All right.  Did you tell her to say anything about your difficulties with taking the exam?

A.   No, because I didn't know what the paperwork was.  I was very confused by what she wanted.  I was scared because I thought that she wanted–she was  going to try to fire me if it's–you know, if it said that I couldn't physically do something, which I can physically do everything. [Rec. Doc. 32-4, p. 83]

On November 9, 2012, Lackey received a fax from the office of Simon's medical provider[1]:  The document included a handwritten notation:

"Ok to perform job duties [and] descriptions with her medical diagnosis of colitis.  This will not interfere [with] her job...." [Rec. Doc. 32-3, p. 32].

Although other forms had been provided by the company to Simon for completion by her healthcare provider, none were completed.  No special accommodations were referenced, recommended or requested.

---

[1]Dr. Luis Alvarez was Simon's doctor, however she had most of her appointments with the physician's assistant who wrote prescriptions.  According to Simon, "everything was done through her." [Rec. Doc. 32-4, p. 81]

10

While the document received from the healthcare provider was limited, it did say that Simon  could perform her job duties and descriptions.  Lackey stated "[i]t did not state anything about an accommodation or a recommended accommodation or anything that would provide us to lead [sic] that Miss Simon needed an accommodation." [Rec. Doc. 32-7, pp. 51-52]. Schlumberger concluded that Simon did not have a disability based on her healthcare provider's confirmation of that fact.

Upon receipt of the documentation, Lackey resumed the termination meeting with Simon.  Lackey showed Simon what the doctor's office had provided and  Simon did not refute its content. After conferring again with Moss and her own supervisor, Lackey completed the termination of  Simon for failing to pass the entrance exam on two attempts.  Lackey told Simon that she, Lackey, did not receive any documentation that would have warranted allowing Simon to reschedule the school and re-take the exam as she had requested. [Rec. Doc. 32-4, pp. 83-84].  In response, Simon next declared that Moss had told her she couldn't go to the doctor. [Rec. Doc. 32-7, p. 54].  That statement was also investigated by Lackey, who confirmed that Moss had, in fact, allowed Simon to keep doctor appointments during her training program, without adverse consequences. [Rec. Doc. 32-6, pp. 6-8].

11

On November 10, 2012, at 6:56 a.m., Simon sent an email to Moss.  In that email, Simon stated:

> I know there is probably nothing that can be done but I will have my Dr.'s office fax over clarification that I do require regular Dr.'s visits and medication to manage my condition. [Rec. Doc. 32-7, p. 115].

No additional medical information was ever provided to the company. [Rec. Doc. 32-7, pp. 79-80].

After going through the EEOC administrative process, Simon filed suit in the 15th Judicial District Court in Lafayette Parish, Louisiana on October 7, 2013. [Rec. Doc. 1-2]. She asserted that  Schlumberger had discriminated against her in violation of the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., by failing to accommodate her disability and the side effects of her medication, and terminating her employment because of her disability.  On November 14, 2013, the case was properly removed to this Court based on federal question jurisdiction. On April 14, 2014, on consent of the parties, the matter was referred to the undersigned to conduct all further proceedings and entry of judgment.

In the motion before the court, Schlumberger argues that Simon requested and received reasonable accommodations from her employer during her pre-test training in Youngsville, Louisiana, and though she stated to her manager that she was not ready for the required Schlumberger entrance exam, she made no request

12

for disability-associated accommodation regarding the exams before she took them, even after she failed the first exam and was encouraged by her Houston instructor to ask for help if she had any difficulties or needed assistance.

Schlumberger asserts that Simon knew she would be terminated when she attended the meeting with her HR manager, having failed the entrance exam twice, and she had referenced the meeting as a termination meeting before the fact. Therefore, the late request for accommodation upon learning of her termination amounted to a 'second chance' request, which is not a required accommodation under the ADA.  Schlumberger argues that Simon cannot make out a *prima facie* case of discrimination based on disability, since she cannot establish that she was treated less favorably than non-disabled employees, and she fails to offer evidence to rebut Schlumberger's legitimate, non-discriminatory reason for the termination decision.

In response to the motion, Simon argues that she was unable to pass the entrance exam in Houston and was sent back to her Youngsville location as a result of her illness and its complications.  She asserts that once she responded to her HR manager's questions about what happened, she disclosed that she had been extremely sick.  After receiving that disclosure, the Schlumberger HR manager began the ADA-required interactive process by giving Simon forms for her

13

physician to complete regarding her illness.  When the paperwork was returned the health care provider declared that Simon could perform the essential functions of her position, Schlumberger cut off the interactive process and terminated her, despite her requests that further inquiry be made with the physician.  Simon contends that this failure to go forward with the interactive process is a violation of the ADA.

## Analysis  and Discussion

*The Summary Judgment Standard*:

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable substantive law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Minter v. Great American Ins. Co. of New York*, 423 F.3d 460, 465 (5th Cir. 2005). A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact. *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.  *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008), *citing Celotex Corp. v. Catrett*, 477 U.S. at 325. The motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. Sun Trust Bank of Georgia*, 431 F.3d 191, 197(5th Cir. 2005).

*The Americans with Disabilities Act:*

The Americans with Disabilities Act prohibits certain employers from discriminating against a qualified individual on the basis of her disability. 42 U.S.C. §12102 *et seq*.  The disputed conduct of the parties in this case occurred on

or after January 1, 2009, therefore the ADA as amended in 2008 applies.  Pub. L.
No. 11o-325, §8,122 Stat. 3553 (2008).  To prevail on her ADA claim, Simon
must establish three elements: 1) she has a disability; 2) she is qualified for the
position in which she seeks employment; and 3) she was discriminated against by
an employer because of her disability.  *Griffin v. United Parcel Service, Inc*., 661
F.3d 216, 222 (5th Cir. 2011).  Since Simon does not allege that she has direct
evidence of discrimination, her claim is subject to the burden-shifting framework
of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Manning v. Chevron
Chem. Co.*, 332 F.3d 874, 881(5th Cir. 2003).

Under *McDonnell Douglas*, the plaintiff must initially present evidence of a
*prima facie* case of discrimination.  If the plaintiff establishes a *prima facie* case,
the burden shifts to the defendant to articulate a legitimate, non-discriminatory
reason for its actions. *Manning,* 332 F.3d at 881.  The defendant's burden is one of
"production, not persuasion, and involves no credibility assessment." *Jinks v.
Advanced Protection Systems Inc.*, 162 F. Supp.2d 542, 546 (N.D.Tex. 2001)
(citing *Reeves v. Sanserson Plumbing Products, Inc.* 530 U.S. 133,142 (2000)).  If
the defendant meets that burden, the burden shifts back to the plaintiff to establish
that the defendant's reason either is a pretext for discrimination or is only one of
the reasons for its conduct and another motivating factor is the plaintiff's protected

16

characteristic. *Adeleke v. Dallas Area Rapid Transit*, 487 Fed.Appx. 901, 903(5th Cir. 2012).

Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. §12112(b)(5)(A). *Griffin v. United Parcel Services, Inc*., 661 F.3d 216, 222 (5th Cir. 2011).  A plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a "qualified individual with a disability;" (2) the disability and its consequential limitations were "known" by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations.  *Feist v. La. Dept. of Justice, Office of Atty. Gen*., 730 F.3d 450, 452(5th Cir. 2013); *Tribble v. Ouachita Parish Police Jury*, 939 F.Supp.2d 626, 632 (W.D.La.2013).

*The Prima Facie Case Analysis*:

To make out a *prima facie* claim of disability discrimination, Plaintiff must show that she (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of her job with or without a reasonable

accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of her disability. *Shryer v. Univ. of Texas Southwest Medical Center at Dallas*, 2014 WL 5315358, *4 (5th Cir. Oct. 16, 2014); *Milton v. Texas Dep't of Criminal Justice*, 707 F.3d 570, 573 (5th Cir. 2013). Discrimination must be a motivating factor of the adverse action. *Maples v. Univ. of Texas Medical Branch of Galveston*, 2013 WL 1777501, at *1-2(5th Cir. April 26, 2013).

The amended ADA [the ADAAA], which became effective January 1, 2009 expanded the coverage provided under the original Act. While retaining the basic definition of 'disability' under the ADA ("a physical or mental impairment that substantially limits one or more major life activities"), the term now can include impairments which are episodic or in remission, and courts "may consider the negative effects of mitigating measures, e.g., effects of medication, in determining whether the individual is substantially limited in a major life activity." ADA Amendments Act of 2008, Sec. 4 §3(4)(E)(1), 122 Stat. 3553, 3556. Schlumberger has not challenged Simon's assertion that she has ulcerative colitis or that her condition may be considered a disability under the ADAAA. Therefore, for the purposes of this motion and the *prima facie* case analysis, the Court will accept that Simon is a person with a disability.

The question whether Simon was "qualified" for the job she held or desired is a more difficult one.  The term "qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position she holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. §1630.2(m).   Whether an individual is a qualified individual with a disability is determined as of the time of the employment decision.

The 'qualified individual criterion and the 'reasonable accommodation' requirement are interrelated.  "Being qualified is determined in relation to the essential functions of the job, and reasonable accommodation by the employer does not require the elimination of an essential function of the job." H. Perritt, Jr., *Americans With Disabilities Act Handbook* §4.18 at 124(3d ed. 1997).  An essential function is a fundamental job duty of the position at issue.  Factors to be considered include the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the current work experience of incumbents in similar jobs.  29 C.F.R. §1630.2(n)(3).  The Court is to give a "significant degree" of deference to an employer's business judgment about the necessities of a job. *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012).

19

The record establishes that Simon passed all pre-training requirements of Schlumberger to be considered for the field engineer trainee position, including a functional capacity examination.  She was offered employment as a field engineer trainee in the company's drilling and measurements section.  The trainee position, which Simon accepted, required that she pass the entrance examination for completion of the Schlumberger-required training course.  In accordance with Schlumberger policy, passing the entrance examination is an essential function of the field engineer position, and the policy was applied uniformly to all field engineer trainees.  The record demonstrates that this was known to Simon, who understood that she would be terminated if she failed to pass the entrance examination on two attempts.  She failed on two attempts to pass the exam.  She neither asked for nor received any accommodation during the testing period.

There is no dispute that  Simon was terminated by Schlumberger after she failed the entrance exam on her second try, an adverse employment action by any analysis. As to that decision, however, there is nothing in the record to demonstrate that Simon was terminated because of a disability or perceived disability or that she was treated less favorably than non-disabled employees in the same situation.  The testimony of  Lackey is that trainees who failed the entrance exam on two attempts were always terminated, since the exam tests for basic

engineering knowledge.  "If you don't pass it, you don't meet our basic standards, and we'll have to let you go." [Rec. Doc. 32-7, pp. 33, 38].  Schlumberger has accommodated trainees during the examination process, and Lackey testified that on at least one occasion, when a trainee asked for extra test-taking time to complete her exams due to a medical condition, she was accommodated after her doctor indicated she needed 50% more test-taking time for her exams.  However, Lackey confirmed that she had never provided an employee more than two opportunities to pass the exam.

Simon could not perform the essential function of passing the entrance exam for the position of field engineer trainee.  There is nothing in the record to demonstrate that Simon could have passed the entrance examination with a reasonable accommodation from her employer, and she did not request accommodation relative to the testing either before or during the examination periods despite clear opportunities to do so.

Simon has offered no evidence that the termination decision was made because of her disability.  Nevertheless, because the plaintiff's burden of demonstrating a *prima facie* case of discrimination is low, the Court will proceed to analyze her discrimination claim under the burden-shifting framework.

*The Employer's Legitimate Non-Discriminatory Reasons*:

The record makes clear that passing the Learning Center entrance exam, described as a general knowledge test, is considered by Schlumberger to be an essential function of the field engineer trainee position.  Passing the exam was one of Simon's job duties. She failed to pass the exam after two attempts, the maximum allowed by her employer for any field engineer trainee.  After failing the entrance examination on her second attempt, Simon's overall performance during the training course was below the standards set by Schlumberger; she was released from the training center and a termination meeting was set. Schlumberger confirmed with Learning Center personnel that Simon made no request for accommodation before or during the testing process, despite opportunities to do so during the in-person meeting with her instructor to discuss her performance on the first exam where she agreed upon an action plan for the best preparation for her second exam.  Even after the invitation to ask for assistance with any difficulty she may have, Simon did not.  Consistent with company policy and company history with other employees (including another trainee from Simon's class), Simon was terminated.  Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate  and nondiscriminatory

as a matter of law. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 701-702 (5th Cir.2014).

The Court finds that Schlumberger has articulated legitimate non-discriminatory reasons for its decision to terminate Simon as of November 2, 2012.

Simon must next demonstrate that Schlumberger's proffered reason for terminating her is actually pretext for its true reason, *i.e.* her disability. The Court determines that Simon has not met her burden of demonstrating or raising a dispute of fact as to pretext.  First, Simon was not shy about asking for accommodation of her colitis condition almost immediately upon arrival at the Youngsville training facility, and her requests were granted for private bathroom facilities and for time to keep scheduled doctors' appointments.  She suffered no penalty or consequence for those requests. Second, Simon knew from the beginning of her training that passing the entrance exam at the Texas Learning Center was a critical performance standard.  She knew that failure to pass the exam would result in termination.  She was apprehensive about the exam when she left Youngsville for the Learning Center, but except for expressing that nervousness, she did not convey to her supervisor any particularized need for accommodation to avoid or delay the testing.  Third, the termination decision was

23

made by Schlumberger before Simon's arrival in Louisiana on November 2, 2012, before Simon mentioned to anyone in company management that she was having problems with her medications and side effects therefrom.  The Court finds that Simon has not adequately raised a dispute of fact through summary judgment evidence that Schlumberger's reason for terminating her for failing the Learning Center entrance exam was pretext.  She has likewise offered no evidence from which to conclude that her alleged disability actually played a role in the employer's decision-making process or had a determinative influence on the outcome *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d at 702*; Pinkerton v. Spellings,* 529 F.3d 513, 519 (5th Cir. 2008).

*Reasonable ADA Accommodation*:

Simon also raises an ADA claim against Schlumberger for the failure to reasonably accommodate her disability.  The ADA provides a right to reasonable accommodation, not necessarily the employee's preferred accommodation, and the employee has the responsibility of informing her employer regarding her perceived needs. "[W]here the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee...to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *EEOC*

24

*v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 621(5th Cir. 2009)(quoting

*Taylor v. Principal Financial Group*, 93 F.3d 155, 165 (5th Cir. 1996).  "When a

qualified individual with a disability requests a reasonable accommodation, the

employer and the employee should engage in flexible, interactive discussions to

determine the appropriate accommodation." *Id.*   When an employer's

unwillingness to engage in a good faith interactive process leads to a failure to

reasonably accommodate an employee, the employer violates the ADA.  However,

"an employer cannot be found to have violated the ADA when responsibility for

the breakdown of the 'informal, interactive process' is traceable to the employee

and not the employer."  *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir.

1999)(cited in *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir.

2011).

     Where a plaintiff alleges a failure to accommodate, the plaintiff must show

that the employer knew about her disability and did not reasonably accommodate

it. At issue in the context of this case is what Schlumberger knew or did not know

about Simon's colitis-related medication regimen and the side effects of the

medications, which Simon now alleges caused her failures to pass the company

entrance examinations and led to her termination.   It is undisputed that Simon

made no mention of her medication side effects to anyone in Youngsville or

Houston through the date she failed the entrance exam for the second time and had a termination meeting scheduled with her HR manager.  After failing the exam for the first time, and knowing the importance of succeeding on her second attempt, Simon had an in-person meeting with her instructor for the express purpose of determining what had caused her failure on the test and formulating an action plan for success on the second testing attempt.  When she failed the exam the second time, on October 31, 2012, Simon was released from the Learning Center to report back to her direct manager.  On November 2, 2012, Simon emailed her instructor, describing her analysis of what she had done wrong on the exam.   Again, no mention was made of any issues with medication. Instead, Simon expressed her conclusion that she had not had proper pre-training on a rig-not enough rig time. Within the same email she confirmed that she was scheduled for termination the same date and her knowledge that the company had a no tolerance policy for school failures.

Simon attended the meeting with Lackey and her Youngsville instructor Moss on November 2, 2012 with the expectation that she would be terminated.  It was then, for the first time, that Simon indicated that she believed she failed the Learning Center entrance exams because of side effects from her medications, and

she requested a third testing opportunity after time to get her medications under control.

In addition, Schlumberger argues that (1) it was not required to engage in the interactive process when Simon made her request for accommodation on November 2, 2012, because its termination decision had already been made in accordance with the company's policy, and the request for accommodation by a third opportunity to take the entrance exam was therefore untimely and unreasonable, and (2) the documentation received from Simon's healthcare provider made no reference to the medication side effects referenced by the plaintiff and called for no accommodation.

It is well-settled that proper accommodation requests under the ADA  are prospective, according to the EEOC's Enforcement Guidance.   "'Since [a] reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability.'" *Brookins v. Indianapolis Power & Light Co.*, 90 F. Supp.2d 993, 1007 (S.D.Ind.2000) (citing U.S.Equal Opportunity Employment Commission, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act at 24, question number 35); see also *Davila v. Qwest Corp.*, 113 Fed. Appx. 849, 854 (10th Cir. 2004) ("[A]s many cases have

27

recognized in various contexts, excusing workplace misconduct to provide a fresh
start/second chance to an employee whose disability could be offered as an after-
the-fact excuse is not a required accommodation under the ADA.") The Fifth
Circuit has explained that an employer is not required to approve a "retroactive
accommodation" or "second chance" excusing prior misconduct stemming from
the alleged disability. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 n. 14 (5th Cir.
1997). Thus, "[W]hen an employee requests an accommodation for the first time
only after it becomes clear than an adverse employment action is imminent, such a
request can be 'too little, too late.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d
78, 90 (1st Cir. 2012).

In the instant case, the Court is not faced with a typical misconduct issue,
but it is faced with Simon's 'second chance' request, made for the first time after
she was notified of her impending termination. The record in this case is detailed
and clear that despite her alleged trepidation about taking the entrance exams, and
after failing on her first attempt, and despite a meeting with her supervisor who
specifically invited her requests for additional assistance, Simon made no
disclosure about any medication effects on her ability to take and pass the exam.
The most opportune time would have been during the meeting with her superviser
to debrief after the first test failure. Yet no information about medications was

28

conveyed to the supervisor and no request for additional time or other accommodation was made for the second testing.  Even after the second failure, which Simon understood to be career-ending at Schlumberger, Simon assigned a totally different reason for failing the exam--not enough rig time.  She made no mention of her health or any of the medication concerns referenced after the fact, although by her deposition testimony, Simon was acutely aware of those things at the time.

It is Simon's burden to demonstrate that her requested accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases.  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002).  In this case the request came too late.  The decision to terminate Simon had already been made, and Simon was aware of the decision before she ever asked for the accommodation she sought after those events.  Despite Simon's suggestion that the termination was not yet official when she made her request, other courts considering such timing have been clear that "courts must not permit the employee to use the ADA as a shield from being fired by suddenly requesting an accommodation before the ink on her valid termination papers is dry." *Blackard v. Livingston Parish Sewer District*, 2014 WL 199629 (M.D.La.2014).  "The ADA does not...create an impenetrable barrier around the disabled employee, preventing the employer from taking any

employment actions vis-a-vis the employee." *Kent v. Roman Catholic Church*, 1997 WL 30201 at *2 (E.D. La. January 22, 1997).  See also *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 796 & n. 3(1st Cir. 1992)(rejecting medical student's claim that school failed to reasonably accommodate his learning disability, in part because student never requested alternative testing method until he had failed exam three times and faced expulsion) and  *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78(1st Cir. 2012)(rejecting insurance salesman's claim that his employer failed to accommodate his medical condition making him unable to concentrate, which he disclosed for the first time after he failed to pass a required licensing examination by the company-set deadline.).

Another element of the reasonableness equation is a showing by the plaintiff of the likelihood of success of the proposed accommodation.  In this case Simon sought additional time to get her medications under control and to restart the training program.  She offered no other detail, and she failed to show how her proposal would allow her to overcome the problem she had with the entrance exam. Finally, since the described accommodation sought by Simon was not supported by any medical directive from her healthcare provider, Simon has failed to satisfy her burden to show facial reasonableness.

*The Interactive Process*:

30

Even though Simon's request for accommodation relative to a third entrance exam opportunity was untimely when made on November 2, 2012, and the employer was not obligated to engage in the interactive process at that point, the record demonstrates that her employer nevertheless responded to the request by opening the ADA interactive process and allowing for consideration of the accommodation  request on internal investigation and on receipt of additional information from Simon's healthcare provider.

Schlumberger argues that upon receipt of documentation from Simon's healthcare provider that Simon could perform her job duties [and] descriptions with her medical diagnosis of colitis, there was nothing to accommodate, and the plaintiff's termination was confirmed.  Simon argues that the sparse response from her healthcare provider should have led to further inquiry by the employer, who shut down further communications.  On this key issue, this Court is left to attempt to isolate the cause of the breakdown in the interactive process, if there was one, and assign responsibility for it. *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

With her career on the line, Simon made little effort to obtain information from her physician to respond to the requests of her employer.  She testified that she told the healthcare provider how to respond to the employer's inquiries,

focusing only on the physical requirements of her job, "scared that if they put anything otherwise, that I would be fired." [Rec. Doc. 32-4, pp. 81-82].  Despite clear written instruction about the discussion she should have with her healthcare provider, Simon specifically did not ask her to say anything about her difficulties with taking the exam. [Rec. Doc. 32-4, p. 83]. She got from her healthcare provider precisely what she asked for, a declaration that she was capable of performing the essential functions and duties of her job.

Upon receipt of the requested information from the health care provider, the employer was on notice that the healthcare provider called for no accommodation, and it was reasonable for the employer to end its inquiry.  Any absence of information about accommodations in the communications between Simon's healthcare provider and Lackey were the result of Simon's acknowledged manipulation of the process.  There has been no showing of any bad faith on the part of Schlumberger relative to the interactive process.  Simon has offered no evidence, by deposition or affidavit, to indicate that her healthcare provider ever provided a medical directive to her relative to her ability to take and pass the entrance exam at issue.  When the provider declared that Simon could perform the essential functions and duties of her job, the accommodation inquiry did not need to go further.

**Conclusion**

Based upon the foregoing, the Court finds that Simon has not adequately raised a dispute of fact through summary judgment evidence that Schlumberger failed to reasonably accommodate her 'second chance' request.  Simon has offered no evidence to explain her own failure to present additional medical evidence to her employer or details of what that additional evidence would have been to change her employment outcome.  Given that failure to act, the breakdown of the interactive process must be charged against the plaintiff.  Accordingly, the Re-urged Motion for Summary Judgment is GRANTED, and the plaintiff's claims are hereby dismissed, with prejudice.

Signed at Lafayette, Louisiana this 26th day of June, 2015.

_____
Patrick J. Hanna
United States Magistrate Judge